**UNITED STATIONERS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 92 C 6065.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 16, 1997.

Roger B. Harris, Kenneth Charles Shepro, Paul M. Daugerdas, Altheimer & Gray, Chicago, IL, David H. Latham, Chicago, IL, for Plaintiff.

James Michael Kuhn, U.S. Attorney's Office, Chicago, IL, Michele Szary Schroeder, U.S. Attorney's Office, Rockford, IL, David S. Newman, Gerald H. Parshall, Jr. (on the brief), U.S. Dept. of Justice, Tax Division, Washington, DC, for Defendant.

## *OPINION AND ORDER*

NORGLE, District Judge:

Before the district court is the issue of an IRS denial of a tax credit to a corporate taxpayer, Plaintiff United Stationers, Inc. ("Stationers"). The district court must also rule on the objections of Stationers to the Report and Recommendation of the Magistrate Judge. Pursuant to Local General Rule 2.41(B), the district court referred to the Magistrate Judge the sole question of whether Stationers was entitled to a tax credit under Internal Revenue Code 26 U.S.C. § 41 (1986) (" § 41") for increasing research activities. The Magistrate Judge conducted a hearing and filed a Report and Recommendation ("Report"), recommending the denial of Stationers' claim for a tax credit under § 41.[1] For the following reasons, the district court overrules all of Stationers' objections except for objection number four (addressing the Magistrate Judge's discussion of the term "innovative"). The district court's opinion not only deals with the objections, but also includes a comprehensive ruling on the merits.

## I.  BACKGROUND

The only issue before the district court is whether Stationers' implementation of eight computer software projects qualifies for a tax credit under § 41. The district court has reviewed all submissions of counsel. With no facts in dispute, the parties filed an agreed statement of facts, some of which are incorporated into this opinion.

Stationers, through its subsidiaries, is the nation's largest independent office supplies wholesaler. Beginning in 1979, Stationers grew at a rapid pace, with annual sales increasing from $100 million to almost $1 billion by 1988. Along with this growth, Stationers began experiencing certain operating inefficiencies which had an adverse effect on customer services.

To become more efficient and to provide better services to its customers, Stationers began to automate and computerize most of its business operations during its fiscal year ending August 31, 1988. Pursuant to this plan, Stationers purchased a software package ("DCS") for $956,000 from a business consulting firm. Stationers purchased DCS for some of its file structure and data access segments, to use as building blocks in the development of its automation project. Stationers used only the file structure and access code elements of part of the full DCS product. Also, Stationers designed all application codes to meet Stationers' particular needs. Finally, Stationers could not have used DCS as delivered, and it was not Stationers' intention to use it in any way other than as a building block.

During its fiscal year ending August 31, 1988, Stationers developed the following software: 1) the Document Retention and Retrieval System ("DRRS") for maintenance of files, customer histories, and purchase rec-

---

**1.** It should be noted that though the parties did not consent to a bench trial before the Magistrate Judge, they did agree to a judgment on the pleadings by the district court based upon the absence of any factual disputes in the case. The parties are reminded that the Report is not considered a final judgment. However, its value in serving as a recommendation should not be underestimated. *See National Metal Finishings, Inc. v. LaSalle National Bank*, No. 94 C 1211, 1995 WL 609312, at *5 (N.D.Ill. Oct.2, 1995) ("Although Magistrate Judges do not have the constitutional authority to decide cases without the consent of the parties," their Reports and Recommendations assist in the administration of justice, "are helpful in the adjudication of cases and are taken very seriously by [district courts].") Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(C), the district court has completely reviewed the Report and arguments of counsel on a de novo basis.

ords; 2) the Central Invoice Project ("CIP") for paperless invoicing and recordkeeping; 3) Concept 90, a computer-run marketing program; 4) Unilink, a computer-to-computer order entry system; 5) the Facility Database Project ("FDP") for inventory records, forecasting and replenishment; 6) the Automated Inbound Shipment Processing Program ("SCS") to automate shipping procedures; 7) the Forecasting/Replenishment Application software to create a more timely inventory control and planning system; and 8) the Receiving System software to improve performance and reliability in warehouse productivity, reduce time for merchandise on the receiving dock, increase inventory turnover, and improve inventory accuracy. (These will be collectively referred to as the "projects.")

Stationers used the projects generally in its business and did not attempt to sell them. In addition, part of Stationers' business was to permit customers and suppliers to access and utilize the projects to a certain extent.

In its original tax return for the taxable year ending August 31, 1988, Stationers deducted the costs of developing the projects under 26 U.S.C. § 174 (" § 174"), which allows a current deduction for research and experimental expenditures. Based on an examination of Stationers' tax return, the IRS agreed to the amounts that Stationers took as deductions under § 174. Good news, for awhile.

In an amended tax return for the taxable year ending August 31, 1988, Stationers claimed a refund for $156,457 based upon § 41's credit for increasing research activities. Stationers computed its § 41 credit wholly upon those amounts that the IRS had previously agreed were properly deducted under § 174. This suit is for the refund of income taxes and interest which Stationers contends were erroneously and illegally assessed against and collected from it prior to Stationers' claim of a § 41 credit for the taxable year ending August 31, 1988. Stationers asserts that it is entitled to the tax credit because it expended considerable amounts of time and money developing the projects for purposes of increasing productivity and to make Stationers more competitive within the office supply industry.

## II. DISCUSSION

### A. Standard of Review

■ Tax credits, like deductions, are matters of legislative grace, and the taxpayer must clearly demonstrate entitlement to the credit. *Hauptli v. Commissioner*, 951 F.2d 1193, 1195 (10th Cir.1991); *Schiff v. United States*, 942 F.2d 348, 352 (6th Cir.1991); *see also New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934) (deductions are a matter of legislative grace).

■ "In a tax refund suit the taxpayer bears the burden of proving the amount he is entitled to recover." *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976) (*citing Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932)). "[T]he Commissioner's tax deficiency assessments are entitled to the 'presumption of correctness.' This presumption imposes upon the taxpayer the burden of proving that the assessment is erroneous." *Pittman v. C.I.R.*, 100 F.3d 1308, 1313 (7th Cir.1996) (*quoting Gold Emporium, Inc. v. Commissioner*, 910 F.2d 1374, 1378 (7th Cir.1990)). "The presumption is not irrebuttable however." *Pittman*, 100 F.3d at 1313. "[T]o rebut the presumption of correctness and shift the burden to the Commissioner, the taxpayer must demonstrate that the Commissioner's deficiency assessment lacks a rational foundation or is arbitrary and excessive." *Id.*

### B. Section 41

Section 41, entitled "Credit for increasing research activities," provides a tax credit for "qualified research" activities. 26 U.S.C. § 41(d)(1) (1986). Even if a taxpayer's research project meets the general requirements for a tax credit under § 41(d)(1), certain exclusions may apply, limiting the availability of the credit. *See* 26 U.S.C. § 41(d)(4). Most relevant here is the exclusion which states that qualified research shall not include, "[e]xcept to the extent provided in regulations, any research with respect to computer software which is developed by (or for the benefit of) the tax-

payer primarily for internal use by the taxpayer...." 26 U.S.C. § 41(d)(4)(E).

■ Though § 41 was enacted over 11 years ago, the Treasury Department has yet to adopt Final Regulations for § 41. Nonetheless, the first step toward adopting a final version of Regulations for § 41 recently went underway when the Treasury promulgated Proposed Regulations in January 1997. *See* Prop. Treas. Reg. § 1,41–4(e), 62 Fed Reg. 82 (1997). We look forward to the adoption of the Final Regulations to aid taxpayers and the courts. At this point, however, the court is aware that Proposed Regulations carry no more weight than a position espoused in a brief *See F W. Woolworth Co. v. Commissioner,* 54 T.C. 1233, 1265–66, 1970 WL 2405 (1970).

In any event, even if Stationers initially qualifies for the tax credit under § 41(d)(1), it must still overcome the exclusionary hurdle under § 41(d)(4)(E). Because the Magistrate Judge denied Stationers' claim under both § 41(d)(1) and § 41(d)(4)(E), the court will examine, in turn, whether Stationers' projects survive under each section.

■ The parties' disagreement as to whether Stationers' several projects were qualified research activities under § 41(d) is at the heart of this dispute. The statute defines qualified research as research:

(A) with respect to which expenditures may be treated as expenses under section 174,

(B) which is undertaken for the purpose of discovering information—

(i) which is technological in nature, and

(ii) the application of which is intended to be useful in the development of a new or improved business component of the taxpayer, and

(C) substantially of all of the activities of which constitute elements of a process of experimentation for a purpose described in paragraph (3).

Such term does not include any activity described in paragraph (4).

26 U.S.C. § 41(d)(1). Though the statute purports to define the term qualified research, the exact meaning of its subsections remains unclear because there is little, if any, case law addressing § 41.[2] Therefore, the court will examine the face of § 41 and its legislative history. In doing so, the court is aware that "[w]ords in a statute are to be given their plain and ordinary meaning." *Yellow Freight System, Inc. v. United States,* 24 Cl.Ct. 804, 807 (1991) (citation omitted). Accordingly, courts look to the contemporary definition provided in a reliable dictionary. *Id.* "If there is neither a plain meaning to the statute nor any express definitions [provided], then the court must look for a clear legislative intent." *Fairchild Industries, Inc. v. United States,* 30 Fed. Cl. 839, 842–43 (1994) (citation omitted), *rev'd on other grounds,* 71 F.3d 868, 874 (Fed.Cir.1995). "Ideally, the legislative intent can be evinced from the plain meaning of the statutory language itself, but if it cannot the court must turn to extrinsic aids such as legislative history, rules of statutory construction, and the construction placed on the statute by the agency that administers it." *Id.* (*citing J.M. Huber Corp. v. United States,* 27 Fed. Cl. 659, 663 (1993)).

The parties do not contest that Stationers' projects qualify for a deduction under § 174 (§ 41(d)(1)(A)), and that the projects were "intended to be useful in the development of a new or improved business component of the taxpayer," § 41(d)(1)(B)(ii). However, the parties vigorously contest whether Stationers' projects were "undertaken for the purpose of discovering information which is technological in nature" under § 41(d)(1)(B)(i), and whether "substantially all of the activities of [the research] constitute elements of a process of experimentation" under § 41(d)(1)(C).

**2.** Though primary authority is scarce, we are enlightened by several articles addressing the § 41 tax credit. *See, e.g.,* Robert L. Black, *R & R Credit Revived by 86 Act but in a Restricted Fashion,* 66 The Journal of Taxation 12 (January 1987); James A. Guadiana, *New Regulations Increase Availability of Tax Benefits for Research and Experimental Costs,* 43 Taxation for Accountants 178 (September 1989); David S. Hudson,

*The Tax Concept of Research or Experimentation,* 45 Tax Lawyer 85 (Fall 1991); Drew. A. Knowles & Frederick R. Parker, Jr. *Is the Deductibility of Costs of Developing Internal–Use Software Still an Issue?,* 83 The Journal of Taxation 82 (August 1995)(primarily focusing on § 174); James C. Zinman, *Corporations Can Use a Partnership to Increase Benefits from R & D Expenses,* 16 Taxation for Lawyers 220 (January / February 1988).

### 1. *Technological in nature*

■ The term "technological" is defined as "resulting from improvement in technical processes that increases the productivity of machines and eliminates manual operations or the operations done by older machines." *Webster's Third New International Dictionary, Unabridged* 2348 (1993). Under this definition, Stationers' projects can be considered technological in nature. That it is not the end of our inquiry, however, for the statute says that research must be undertaken "to discover" information that is technological in nature. 26 U.S.C. § 41(d)(1)(B)(i).

The plain meaning of the term "discover" is "to make known (something secret, hidden, unknown, or previously unnoticed)" or "to obtain for the first time sight or knowledge of." *Webster's Third New International Dictionary, Unabridged* 647 (1993). Although we are reluctant to enter the bramble bush of legislative intent, we note that the legislative history of § 41 attempted to explain what "discovering information that is technological in nature" means. *See* H.R. Conf Rep. No. 99–841, at II–71 (1986) ("Conference Report"). The Conference Report stated that "[t]he determination of whether the research is undertaken for the purpose of discovering information that is technological in nature depends on whether the process of experimentation utilized in the research fundamentally relies on principles of the physical and biological sciences, engineering, or computer science...." *Id.* The inclusion of the term "process of experimentation" in the above statement serves only to further muddy the waters by presupposing that the research project in question qualifies as an experimental process. Nonetheless, that statement does imply that a research project qualifying for a § 41 credit must entail some sort of discovery. Indeed, the Conference Report clarified its inclusion of computer science by adding the following explanation in a footnote: "Research does not rely on the principles of computer science merely because a computer is employed. Research may be treated as undertaken to discover information that is technological in nature, however, if the research is intended to expand or refine existing principles of computer science." *Id.* at 666–67 n. 3.

In this case, Stationers initially purchased a software package from a consulting firm to serve as a building block in the development of its projects. Though Stationers designed the application codes from the software package to meet its particularized needs, there is no evidence that it "discovered" any information which was technological in nature; nor can it be said that Stationers intended "to expand or refine existing principles of computer science." Rather, Stationers merely applied, modified, and at most, built upon, pre-existing, technological information already supplied to it. This is a far-cry from what Congress contemplated when it spoke of research directed at the "principles of computer science." *See TSR, Inc. v. Commissioner of Internal Revenue,* 96 T.C. 903, 920, 1991 WL 110430 (1991) (taxpayer's gathering of pre-existing information and incorporating it into a computer game was not directed at, and did not result in, any technological breakthrough). This view is also consistent with the legislative comment discussing the addition of the "technological in nature" requirement to § 41:

> The committee believes that the definition [of qualified research] has been applied too broadly in practice, and some taxpayers have claimed the credit for virtually any expenses relating to product development. According to early data on the credit ... many of these taxpayers do not engage in high technology activities.

S.Rep. No. 99–313, at 694–695 (1986); *see also* H. Rep. No. 99–426, at 178 (1986). Accordingly, the court holds that Stationers' projects fail to meet the technological in nature requirement under § 41(d)(1)(B)(i).

### 2. *Process of Experimentation*

■ To be considered qualified research, a project must also be research for which "substantially all of the activities constitute elements of a process of experimentation" for one of the following purposes:

(i) a new or improved function,

(ii) a new or improved performance; or

(iii) reliability or quality.

26 U.S.C. § 41(d)(1)(C) *(referring to* 26 U.S.C. § 41(d)(3)(A)). Stationers' projects

meet the latter part of this requirement, in that they were implemented to improve function,. performance and reliability. At issue, however, is whether the projects were implemented as part of a "process of experimentation."

Experimentation is defined as "the act, process, or practice of making experiments." *Webster's Third New International Dictionary Unabridged* 800 (1993). Experiment is defined as "a test or trial" or "a tentative procedure or policy; [especially] one adopted in uncertainty as to whether it will answer the desired purpose or bring about the desired result." *Id.* While consistent with the above definition, the legislative history on the meaning of "process of experimentation" provides further explanation:

> The term process of experimentation means a process of involving the evaluation of more than one alternative designed to achieve a result where the means of achieving that result is uncertain at the outset. This may involve developing one or more hypotheses, testing and analyzing those hypotheses (through, for example, modeling or simulation), and refining or discarding the hypotheses as part of a sequential design process to develop the overall component.

> Thus, for example, costs of developing a new or improved business component are not eligible for the credit if the method of reaching the desired objective (the new or improved product characteristics) is readily discernible and applicable as of the beginning of the research activities, so that true experimentation in the scientific or laboratory sense would not have to be undertaken to develop, test, and choose among viable alternatives.... [E]ngineers who design a new computer system, or who design improved or new integrated circuits for use in computer or other electronic products, are engaged in qualified research because the design of those items is uncertain at the outset and can only be determined through a process of experimentation relating to specific design hypotheses and decisions as described above.

H.R. Rep. Conf. Rep. No. 99–841, at II–72 (1986).

This language is also consistent with legislative history predating the enactment of § 41. Initially, the credit for increasing research activities was enacted as 26 U.S.C. § 44F, then redesignated § 30, and finally, changed to § 41. In discussing the former § 44F in the Tax Incentive Act of 1981 (H.R. 4242), the Committee on Ways and Means stated that only the costs of developing new or significantly improved computer programs, where their operational feasibility was seriously in doubt, could be included in computing the credit under § 44F. H.R.Rep. No. 97–201, at 114 (1981). Therefore, the court must decide how much uncertainty, if at all, existed about the projects' designs at the outset of their· development by Stationers.

In its objections to the Magistrate Judge's Report, Stationers does not adequately address whether the development of the projects involved any degree of uncertainty. Rather, Stationers merely makes the following conclusory statement: "[T]he uncertainty that was involved in this process is identified in each project summary." (Plaintiff's Memorandum in Support of Objections at 12.) A review of each project summary reveals that Stationers' claim of uncertainty is not persuasive. *(See* Agreed Statement of Facts, Exhibits 3–9.) In these summaries, Stationers repeatedly refers to its inability to predict the eventual results of each project once in operation and applied. For instance, in describing the "Concept 90" project, Stationers refers to its concern as to whether any benefits such as increased sales, dealer acceptance, and ordering efficiencies would materialize once the project was in operation. (Agreed Statement of Facts, Exhibit 5, p. 2). Similarly, while describing the "CIP" project, Stationers refers to its uncertainty about whether the project would "provide an adequate return on [Stationers'] investment of time, money and resources." (Agreed Statement of Facts, Exhibit 4, p. ·2.) Absent in any of these summaries, however, is an adequate account describing any uncertainty about the projects' designs that Stationers faced at the outset of developing these projects. In other words, while the aspired benefits of the projects were in doubt, the development of the means that would allow Stationers to potentially achieve those benefits was not. *See also* S.Rep. No. 99–313, at 696 (1986) (pro-

cess of experimentation "means a process of scientific experimentation or engineering activities to design a business component where the design of the component as a whole is uncertain at the outset. . . .") As such, the development of Stationers' projects did not entail a process of experimentation.[3]

### C. Computer Software Exclusion

#### 1. Software primarily for internal use

■ Though the projects' failure to meet either of § 41's general requirements under subsection (d)(1) results in the denial of Stationers' claim, the court will also examine whether § 41(d)(4)(E) precludes Stationers' receipt of the credit. Section 41(d)(4)(E) provides that research that would otherwise qualify under § 41 is excluded from receiving the credit if the research was for the development of "internal use" computer software. § 41(d)(4)(E). The Magistrate Judge, while assuming *arguendo* that Stationers met all the other requirements under § 41, concluded that the credit was still unavailable because Stationers' projects were expressly excluded as "internal use" computer software. The Magistrate Judge examined the legislative history of § 41 and reasoned that Congress' intent was "to allow the credit only where the research and resulting developments extend beyond the front door of the developer to help the American economy." Report at 12. Stationers objects to the Magistrate Judge's conclusion and argues that its projects were not internal use software, but rather software used in Stationers' core business (*e.g.*, sales, marketing, purchasing, inventory control, warehousing and delivery) for which it earns revenue from customers.

■ Like the general requirements under § 41, the exclusion "software that is de-

veloped primarily for internal use" is not defined in the statute, Treasury Regulations, or case law. The Conference Report on § 41 explained that software used for "general and administrative functions (such as payroll, bookkeeping, or personnel management) or in providing noncomputer services (such as accounting, consulting, or banking services)" are examples of internal use software and, thus, excluded from the statute. H.R. Rep. Conf. Rep. No. 99–841, at II–73 (1986). Additionally, the Treasury's Proposed Regulations state that "all relevant facts and circumstances are to be considered in determining if computer software is developed primarily for the taxpayer's internal use." *See* Prop. Treas. Reg. § 1.41–4(e), 62 Fed Reg. 82 (1997). Though the Proposed Regulations are not binding, the court agrees that a "totality of the circumstances" is the most appropriate standard to judge whether Stationers' developed its projects primarily for internal use.

Under a totality of the circumstances test, the court holds that the Magistrate Judge was correct in concluding that Stationers' projects were developed primarily for internal use. For instance, the DRRS project allowed Stationers to store and view invoice data and sales history on-line. The same can be said about the Central Invoice Project ("CIP"), which centralized Stationers' invoices on-line and eliminated the inefficiencies associated with maintaining hardcopy data. Also, Stationers developed the Concept 90 project to streamline its ordering operations and pricing. Though the Unilink system served outside vendors, it was essentially an inventory control system designed to modernize Stationers' ordering system and

---

**3.** The court is in agreement with the Magistrate Judge's analysis of the requirement of a process of experimentation:

Congress envisioned the tax credit for ventures into uncharted territory. The activities undertaken by Plaintiffs in developing the [projects] do not rise to the level of required experimentation. First, it is not even clear what "hypotheses" Plaintiff was "researching". Furthermore, Plaintiff's research did not venture into an uncertain field, nor did it provide the technology to utilize computers in a manner that was never before available. To the contrary, computers and computer software had long been used as a device to increase business

efficiency. The capacity of computers to be utilized as a tool for bookkeeping was not uncertain, nor was there any uncertainty as to whether a computer could perform these functions. Finally, the goal of Plaintiff's "research" was to enable greater utilization of the computer for its *own* business purposes, by utilizing already established technology, not to develop a new realm of science.

Report at 10. We would add that purchasing a software package from a business consulting firm in 1988, albeit it was used only as a "building block," did not take Stationers to the cutting edge of technological advancement.

to allow Stationers to bill orders from other divisions. Likewise, the Facility Database Project ("FDP") was designed to achieve hierarchy of data with respect to inventory items and eliminate any redundancy of data. As the name indicates, the Forecasting/Replenishment Application was designed to forecast inventory levels and allow for quick replenishment of items out-of-stock. The goal of the Automated Inbound Shipment Processing Program ("SCS") was to improve shipping operations in conjunction with the Receiving System project. Under that latter project, Stationers sought to improve performance and reliability in warehouse productivity, reduce time for merchandise on the receiving dock, increase inventory turnover, and improve inventory accuracy. Stationers concedes that the term internal use "by its plain meaning implies utilization within the confines of an organized structure...." (Plaintiff's Memorandum in Support of Objections at 5). Indeed, a review of each of Stationers' projects reveals that they were designed for internal use.

This review also supports the Government's assertion that the projects were developed "to provide essentially bookkeeping services in tracking [Stationers'] massive inventory and allowing plaintiff to fill orders and price those orders to stay competitive." (Government's Response to Plaintiff's Objections at 9.) In the long run, of course, these projects would also benefit Stationers' customers in that reduced inefficiencies would lead to reduced costs, and ideally, to reduced prices. However, the ultimate benefit that Stationers' customers would potentially receive does not obscure that Stationers' projects were primarily for internal use. As such, Stationers' argument that its projects encompassed substantial external use is not persuasive. To the contrary, the functions of

each project are sufficiently similar to the ones that the Conference Report included in its list of examples of internal use software. Moreover, it appears that the projects were developed, at least in part, to improve Stationers' management accounting system.[4] Accordingly, the court holds that Stationers' projects were the type of internal use software that Congress specifically sought to exclude from the § 41 research credit.

### 2. *Exception to the Internal Use Exclusion*

■ Though Stationers developed its projects primarily for internal use, it could still arguably be entitled to the tax credit under an exception to § 41's internal use exclusion. *See* H.R. Rep. Conf. Rep. No. 99–841, at II–73 (1986).[5] The exception allows a tax credit for internal use software if the software is innovative, the software development involved a significant economic risk, and the software is not commercially available. *Id.* After the parties agreed that Stationers' projects were not commercially available, the Magistrate Judge concluded that the projects failed to meet the other two requirements under the exception. Thus, the court will limit its discussion to whether Stationers' projects were innovative and whether they involved a significant economic risk.

With respect to the first requirement, legislative history defines "innovative" to be "where the software results in a reduction in cost, or improvement in speed, that is substantial and economically significant." *Id.*[6] Though the Magistrate Judge was correct in reasoning that Stationers' projects "simply increased efficiency and revenues for Plaintiff," a review of each project summary indicates that they all fall under the plain meaning of the definition included in the legislative history. Thus, the court dis-

---

**4.** "Management accounting, focusing on internal customers, is the process of identification, measurement, accumulation, analysis, preparation, interpretation, and communication of information that assists executives in fulfilling organizational goals. A synonym is internal accounting." Charles T. Horngren & George Foster, *Cost Accounting, A Managerial Emphasis*, at 4 (7th ed.1991).

**5.** In the Conference Report, the conferees intended that the exception would be included in the forthcoming issuance of Treasury Regulations on

§ 41. However, the Treasury has yet to adopt Final Regulations on § 41. *See, supra* page 5. Nonetheless, the exception is included in the Conference Report and the Proposed Regulations. *See* Prop. Treas. Reg. § 1.41–4(e)(5).

**6.** The Proposed Regulations addressing § 41 heighten this requirement by stating that the "legislative history indicates that Congress intended to limit the credit for the costs of developing internal-use software to software meeting a high threshold of innovation." Prop. Treas. Reg. § 1.41–4(e)(6).

**1288**

agrees with the Magistrate's conclusion on this prong, and holds that Stationers' projects were innovative.

Innovation is not enough, however. Stationers' projects fail to qualify for the exception because they do not meet the second requirement, *i.e.*, the involvement of significant economic risk. The Conference Report defines "significant economic risk" as "where the taxpayer commits substantial resources to the development and also there is substantial uncertainty, because of technical risk, that such resources would be recovered within a reasonable period." *Id.* Based on this definition, the Magistrate Judge determined that Stationers' projects did not involve significant economic risk because "the ability to implement [the projects] was clear from the outset. The only risk or uncertainty was whether the [projects] would produce the desired efficiency, not whether they could, in fact, be developed." Report at 13. The court agrees. Granted, Stationers invested considerable sums of money for the development of its projects. However, Stationers' claim that "[i]t is the uncertainty of success that creates the risk" is simply not persuasive. Of course, spending over a million dollars ordinarily has inherent risks, but the amount of the expenditure is not a dispositive factor. The proper inquiry is on the technical risk, which refers to the ability of Stationers to develop the projects. Here, there was not substantial uncertainty because the technical risk was minimal, if at all. Therefore, because the projects do not meet this prong of the exception, Stationers fails to overcome the internal use exclusion.

### III. CONCLUSION

Stationers has failed to show that its projects met the requirements for a tax credit under 26 U.S.C. § 41. Accordingly, the court denies Stationers' claim for a tax credit for increasing research activities.[7]

IT IS SO ORDERED.

7. Several parties not directly involved in this case moved for leave to file briefs as amicus curiae. The court denied the parties' motions because it determined that the Government and Stationers adequately and thoroughly addressed the issue at bar. Moreover, the court believed that any amicus curiae briefs would not provide further enlightenment. Recently, Chief Judge Posner wrote an insightful opinion on amicus curiae briefs that confirmed the reasoning behind the court's decision. *See Ryan v. Commodity Futures Trading Commission*, 125 F.3d 1062,

1063–64 (7th Cir.1997). Chief Judge Posner opined:

> The vast majority of amicus curiae briefs are filed by allies of litigants and duplicate the arguments made in the litigants' briefs, in effect merely extending the length of the litigant's brief. Such amicus briefs should not be allowed. They are an abuse. The term "amicus curiae" means friend of the court, not friend of a party.
> *Id.*